**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| PRISON LEGAL NEWS, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| *v.* | § | |
| | § | CASE NO. 2:12-CV-00699-JRG |
| ANTHONY BETTERTON, *et al.*, | § | |
| | § | |
| *Defendants* | § | |
| | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Plaintiff Prison Legal News's ("PLN") Motion for Preliminary Injunction (Dkt. No. 2), filed November 1, 2012. The Court having fully considered the same finds that the Motion should be **GRANTED IN PART AND DENIED IN PART** for the reasons set forth below.

## I. BACKGROUND

Plaintiff alleges ongoing violations of its rights under the First and Fourteenth Amendments to the United States Constitution as well as its rights under Article I, Section 8 of the Texas Constitution. The underlying facts are as follows:

Plaintiff publishes *Prison Legal News*, a monthly magazine about the legal rights of incarcerated persons, as well as books about prisoners' rights. Defendants administer or are otherwise responsible for the Upshur County Jail ("UCJ" or the "Jail"). In the past, PLN has sent its publications to inmates at UCJ and intends to continue sending its publications there in the future.

Some portion of PLN's mail to UCJ inmates does not reach its intended recipients. PLN claims that since July 2011, PLN has received returned copies of its magazines and books,

variously stamped with phrases such as "Refused," "Returned to Sender," "No Newspaper," and "RTS" (Dkt. No. 23, at 6). The reasons for these returns are unclear. PLN claims that the returns evince a policy of either total prohibition of communications, content-based censorship, or arbitrary censorship (Dkt. No. 2, at 4-6). Defendants contend that they "have never rejected a PLN publication due to its content, or otherwise censored PLN's publications in any way" (Dkt. No. 26, at 3). They claim that they routinely deliver PLN publications to UCJ inmates, but suggest inherently that PLN publications are often returned because the recipients either refuse delivery or, given the transient nature of jail populations, no longer reside in the UCJ. *Id.*, at 4.

Prior to September 2013, PLN's correspondence with UCJ inmates was governed according to the following written Jail policy:

> All other mail will be censored and inspected by correctional staff. Should any of these contain inflammatory writings, plans of escape, manufacture of drugs, weapons, or explosives, that would encourage deviant criminal sexual behavior, or otherwise lessen jail security, the information will be forwarded to the Jail Administrator. In the event this material contains restricted information, the Sheriff will be advised as well as possible intervention by the Disciplinary Board.
>
> All periodicals, magazines, newspapers, and other similar items will be individually inspected. This inspection will be conducted to ensure these items do not contain restricted information and will be rejected on a case by case basis. All such materials must have prior approval to be received and must be mailed from the publisher to the inmate.

(Dkt. No. 2-2, at 3-4). The UCJ Prisoner Rules of Conduct and Handbook further specifies that "[t]he final say as to what will and will not be accepted lies with the Jail Administrator in conjunction with the jail's legal counsel. Should you wish to appeal the Jail Lieutenant's decision, you may do so by filing a written request" (Dkt. No. 2-3, at 13). The Jail's policy prior to September 2013 contained no provision for notice to either the sender or the recipient of censored mail, and no suggestion of a process by which the sender of mail (rather than the recipient) could appeal the Jail official's decisions.

In September 2013, and after the present request for a preliminary injunction was filed, UCJ amended its Correspondence Policy. The new policy provides somewhat more detailed standards for censoring mail's content and sketches procedures for notice and appeal with respect to both senders and recipients:

> Some correspondence may be rejected, on a case-by-case basis, provided it falls under one of the following definitions:
>
> a. Material that contains information regarding the manufacture of explosives, weapons, or drugs;
>
> b. Material that a reasonable person would construe as written solely for the purpose of communicating information designed to achieve the breakdown of jails through inmate disruption such as strikes or riots;
>
> c. Material for which a specific factual determination has been made that it is detrimental to inmate's rehabilitation because it would encourage deviant, criminal, or sexual behavior or otherwise be adverse to legitimate penological interests.
>
> The Sheriff, Chief Deputy, or Jail Administrator will be the authority to consider appeals or rejected mail listed under c.
>
> The inmate and the sender will be informed of any rejection of mail and the reason for rejection. Any rejected mail will be retained and filed in the inmate's personal property file. Each publication will be accepted or rejected individually.
>
> . . . .
>
> . . . . All mail coming from or being sent to the general public can be opened and read. If contraband is found it may be confiscated and the inmate advised of this action. . . .
>
> Outgoing and incoming non-privileged correspondence may be censored provided a legitimate penological interest exists. A copy of the original correspondence should be retained.

(Dkt. No. 42-1, at 6-7). UCJ officials have agreed to "abide by and enforce" the new Correspondence Plan, and have no plans to revive the previous policies (Dkt. No. 42-1, at 3). Defendants claim that the new Correspondence Plan moots Plaintiff's Motion for a Preliminary

Injunction; Plaintiffs contend that their motion remains meritorious even despite the change in Jail policy.

## II. LEGAL STANDARDS

The Court may grant a preliminary injunction to prevent imminent harm to a party. In order to merit a preliminary injunction, a plaintiff must prove: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest. *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011). When the injunction is sought against "public institutions and public servants" the third and fourth prongs of this test may blend into a single public interest analysis. *Spiegel v. City of Houston*, 636 F.2d 997, 1002 (5th Cir. Unit A Feb. 1981).

The First Amendment to the United States Constitution guarantees freedom of speech and of the press. U.S. CONST., amend. I. "Publishers who wish to communicate with those who, through subscription, willingly seek their point of view have a legitimate First Amendment interest in access to prisoners." *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989). Regulations affecting the sending of a publication are analyzed under a deferential but "not toothless" reasonableness standard. *Id.* at 413-14 (citing *Turner v. Safley*, 482 U.S. 78, 89 (1987). Restrictions on these rights must be "reasonably related to legitimate penological interests," and those interests must be "unrelated to the suppression of expression." *Id.* at 404, 415 (quoting *Turner*, 482 U.S. at 89, and *Procunier v. Martinez*, 416 U.S. 396, 413 (1974)).

Under the Fourteenth Amendment to the United States Constitution, no State may "deprive any person of life, liberty, or property, without due process of law." U.S. CONST.,

amend. XIV. Here, where both senders' and recipients' First Amendment rights are at stake, the Fifth Circuit has recognized due process requirements for "notice and an opportunity to be heard" with respect to each. *Prison Legal News v. Livingston*, 683 F.3d 201, 222 (5th Cir. 2012); *accord Prison Legal News v. Lehman*, 397 F.3d 692, 699 (9th Cir. 2005); *Jacklovich v. Simmons*, 392 F.3d 420, 433 (10th Cir. 2004); *Prison Legal News v. Cook*, 238 F.3d 1145, 1152-53 (9th Cir. 2001); *Montcalm Publ'g Co. v. Beck*, 80 F.3d 105, 109 (4th Cir. 1996). These procedural protections need not extend to duplicative determinations of parties' rights, but may require that parties objecting to censorship be allowed to participate in any appeals process. *See Livingston*, 683 F.3d at 223-24.

The Texas Constitution's free speech provisions extend further than the First Amendment to the United States Constitution. *See Davenport v. Garcia*, 834 Sw.2d 4, 10 (Tex. 1992). Plaintiff suggests that the Jail's Correspondence Plan effects a prior restraint on speech, presumptively prohibited by the Texas Constitution (Dkt. No. 2, at 7). No authority known to the Court suggests that such a result would be consistent with Texas law. In the absence of authority to the contrary, it seems only reasonable to assume that the provisions of the United States and Texas Constitutions should be interpreted in parallel; which this Court now undertakes to do.

## III. ANALYSIS

The evidence suggests that at least some of PLN's correspondence with prisoners has been withheld from its intended recipients, depriving Plaintiff of its First Amendment rights without due process of law. Though a clear improvement over the past, the Court believes that UCJ's revised Correspondence Plan still falls short of establishing the minimum procedural safeguards constitutionally required to protect PLN's First and Fourteenth Amendment rights.

Accordingly, in the Court's view, PLN is likely to prevail on the merits of its case; UCJ's current policy threatens imminent and irreparable harm; and the balance of equities tilts clearly toward an injunction. Such being the case, the Court finds that a preliminary injunction is appropriate here.

**A. Likelihood of Prevailing on the Merits**

1. <u>Due Process Arguments</u>

Plaintiff claim that Defendants deprived them of their First Amendment rights without due process of law. The Court finds that for purposes of this preliminary injunction, PLN has carried its burden with respect to these claims.

PLN has introduced into the record UCJ's written policies governing correspondence prior to September 2013 (Dkt. No. 2-2, 2-3). These policies are unconstitutional, in that they allowed Jail employees to censor PLN's correspondence without notifying PLN or allowing PLN an opportunity to be heard. *See Livingston*, 683 F.3d at 222. Even the inmates' right to appeal such censorship was tenuous at best, since no then-existing policy required prisoners to be notified when their mail was withheld. Under these policies, any interference with PLN's right to communicate with inmates worked an unconstitutional deprivation of PLN's rights under the First Amendment and the Due Process Clause of the Fourteenth Amendment.

PLN avers that it has often sent mailings to UCJ inmates that have never reached their intended recipients (Dkt. No. 23, at 5-6). To substantiate its claim that UCJ policies prevented PLN from communicating with inmates, it offers the declaration of Devadus Nelson (Dkt. No. 29-1),[1] an inmate at UCJ, who subscribes to PLN but at least four times has not received

[1] Defendants see a "stark contrast" between the "wholesale violation[s]" alleged by Plaintiff and the "one declaration" offered as evidence before the Court (Dkt. No. 30, at 2). However, Plaintiff apparently sought to take more declarations but was refused access by jail officials (Dkt. No. 29, at 5 n.3).

requested issues.[2] Moreover, some PLN publications have been returned to PLN bearing markings such as "No Newspaper"—a stamp that clearly suggests the interposition of UCJ policy between communicating parties (Dkt. No. 23, at 6). These facts are sufficient to establish, to the Court's satisfaction, that UCJ has deprived PLN of its First Amendment rights without due process of law.

To counter this evidence, Defendants offer the declaration of Defendant McCauley, who claims that "no copy of *Prison Legal News* has been rejected by the Jail due to its content, and neither I nor the Sheriff's Office has made any determination that *Prison Legal News* should be rejected as a prohibited publication" (Dkt. No. 26-1, at 2). This declaration, however, is not inconsistent with deprivations of PLN's rights: the issue, from a Due Process standpoint, is not *why* PLN's publications were rejected—the issue is *whether* UCJ rejected PLN publications at all, and, if so, under what procedures. Any rejection of prisoners' mail—even rejections not based on content—requires adequate procedural safeguards under the Constitution.

McCauley further suggests, but does not declare, that PLN's mail was rejected for benign reasons. *Id.* However, her explanations are wholly conjectural. That alone is enough for the Court to find for Plaintiffs here. Additionally, when McCauley's explanations are read in light of Nelson's declaration, they are even more wanting. First, Nelson's declaration directly casts doubt on the idea that prisoners are refusing delivery of *Prison Legal News* en masse. Nelson avers that he affirmatively subscribed to PLN, and wanted to read the publication, but did not receive his copy (Dkt. No. 29-1, at 2). Second, PLN claims that many of its returned publications were stamped "No Newspapers" (Dkt. No. 23, at 6). This stamp, though cryptic, suggests a policy that

[2] Defendants suggest that either Mr. Nelson is lying or that PLN might not have sent Nelson his missing issues (Dkt. No. 30, at 2-3). Given the volume of mail returned to PLN and the inadequacy of UCJ's correspondence procedures, the Court finds it more likely that UCJ failed to deliver *Prison Legal News* to Mr. Nelson than that PLN—a company in the business of delivering its mail to readers—failed to mail it. Moreover, it sees no reason not to credit Mr. Nelson's sworn statement in the absence of any evidence in contradiction.

goes beyond mere prisoner unavailability or refusal and reveals movement by UCJ into the territory of material interference with communicative rights. In light of this evidence, the Court finds it probable that Plaintiff will prevail on its Due Process claims, at least with respect to its actions before September of 2013.

Without doubt, UCJ's recently promulgated Correspondence Plan is a significant improvement on the Jail's previous policies. It explicitly requires that both "[t]he inmate and the sender will be informed of any rejection of mail and the reason for rejection" (Dkt. No. 42-1, at 6). The new policy also seems to make room for an appeals process, though its provisions are lacking in specific detail. Such right of appeal, however, extends only to mail rejected for "detriment[] to inmate's rehabilitation." The right of appeal appears, by negative implication, to be inapplicable to mail withheld because it "contains information regarding the manufacture of explosives, weapons, or drugs," or mail "designed to achieve the breakdown of jails through inmate disruption" (*Id.* at 7). Of further concern, there appear to be two separate bases for censorship written into the Correspondence Plan: a set of content-based standards contained in Section IV, where an appeal is implied; and a blanket provision in Section VI allowing censorship "provided a legitimate penological interest exists." No appeal is provided or even suggested for censorship in Section VI. The Court views these as constitutionally based defects in the Correspondence Plan, especially since the Plan anticipates avenues of censorship with no attendant procedural protections.

Finally, the current language in the Correspondence Plan is impermissibly vague about the required procedures. In the absence of timelines, clearly defined roles, or guidelines as to the form of an appeal, the promised procedural safeguards are, as a practical matter, under the unilateral control of the implementing official. Such open-ended discretion is incompatible with

traditional notions of due process. *Cf. Wolff v. McDonnell*, 418 U.S. 529 (1974) (holding prison procedures acceptable in part because its authority was "not left at large with unlimited discretion," but operated according to standards including mandatory times and places of meeting and principles of decision).

As long as UCJ continues to operate under constitutionally defective procedures for handling correspondence, PLN is potentially subject to unconstitutional deprivations of its rights under the First and Fourteeenth Amendments. The Court finds that PLN has established a likelihood of success on the merits with respect to its ongoing claims for injunctive relief.

2. First Amendment Claims

In addition to its Due Process claims, Plaintiff has alleged violations of its substantive First Amendment rights—that UCJ has deliberately censored PLN's communications with prisoners on the basis of either prejudice against PLN content or an impermissibly arbitrary discretion. Defendants deny these allegations. Unfortunately, because Defendants' procedures for handling inmate correspondence have been deficient, there is very little in the way of actual evidence with respect to Plaintiff's substantive First Amendment claims. No reasonableness analysis under *Turner v. Safley* is possible, since no record of official censorship or its rationale is available to the Court. *See* 482 U.S. 78, 89 (1987).[3]

There is, however, evidence of at least some substantive First Amendment harms. A "No Newspaper" policy, even inconsistently applied, would be an unconstitutional First Amendment harm. *See Mann v. Smith*, 796 F.2d 79, 81 (5th Cir. 1986). Also, the Jail's inconsistent record of delivery by itself suggests an unconstitutionally arbitrary policy. *See City of Lakewood v. Plain*

---

[3] The Court notes that Defendant McCauley's declaration that "no copy of *Prison Legal News* has been rejected by the Jail due to its content" is fully consistent with unconstitutional policies that are overbroad but not content-based (e.g., a loosely enforced "No Newspapers" policy) or with policies that are unconstitutionally arbitrary (Dkt. No. 26-1, at 2).

*Dealer Publ'g Co.*, 486 U.S. 750, 759 (1988). While much of the evidence—packages simply marked "Refused" or "Return to Sender"—might plausibly have been refused for the benign reasons Defendant McCauley suggests (*see* Dkt. No. 23, at 6; Dkt. No. 26-1, at 2), because UCJ's policy required no notice, hearing, or record when a piece of mail was censored, there is no easy way from the record to distinguish between the most insidious First Amendment harms and the most ordinary and sensible jail practices. However, what evidence does exist suggests at least some violations of PLN's substantive First Amendment rights. Plaintiff has demonstrated a likelihood of success on the merits with respect to its First Amendment claims prior to September 2013.

In the absence of further injunctive relief, Plaintiff could expect continuing impingements on its First Amendment rights. As explained above, even Defendants' September 2013 policy is constitutionally flawed from a due process standpoint. Defects in process can foster violations of substantive rights—indeed, perhaps the most crucial reason for requiring process is that it is necessary to protect underlying rights. *See Matthews v. Eldridge*, 424 U.S. 319, 334-35 (1976). Even the Jail's improved 2013 policy allows significant latitude for unconstitutional censorship from which PLN is entitled to be protected. Plaintiff has thus established a likelihood of success on the merits of its claim for injunctive relief with respect to its substantive First Amendment Claims.

**B. Substantial Threat of Irreparable Injury**

For Plaintiff to be entitled to a preliminary injunction, it must establish not only a likelihood of success on the merits but also a substantial threat of irreparable injury. *Janvey*, 647 F.3d at 595. For the purposes of the present motion, a harm is irreparable if it cannot be undone through money damages. *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th

Cir. 2012). "The 'loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction.'" *Palmer ex rel. Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 506 (5th Cir. 2009) (quoting *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B Nov. 1981).[4]

Though Defendants' new Correspondence Plan is an improvement over the prior policy, it does not remove the threat of irreparable harm, for at least two reasons. First, as noted above, the Correspondence Plan is constitutionally flawed, and any future censorship is likely to violate Plaintiff's rights. This Plan effectively invites violations of Plaintiff's substantive First Amendment rights. Second, although UCJ's Correspondence Plan suggests reform, it outlines a "voluntary cessation" of unconstitutional conduct, which "does not preclude a finding of irreparable injury." *Doe v. Duncanville Indep. Sch. Dist.*, 994 F.2d 160, 166 (5th Cir. 1993). "The crucial test" in such circumstances "is whether it can be said with assurance that there is no reasonable expectation that the wrong will be repeated." *Id.* The burden of persuading the court that the Correspondence Plan establishes that assurance lies with Defendants, and they have not met it in the Court's view. *See U.S. v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968).[5]

Indeed, Plaintiff has objective reasons to expect continuing violations of its rights. First among these is basic human nature: Plaintiff has started a fight with Defendants by bringing this lawsuit against them in this Court. From that the Court can anticipate at least some degree of

[4] Plaintiff claims that violations of due process rights are in themselves irreparable (Dkt. No. 2, at 8). It appears, though, that courts usually examine violations of due process through the irreparability of the underlying harm. *See, e.g.*, *Advocacy Ctr. for Elderly and Disabled v. La. Dept. of Health and Hosps.*, 731 F.Supp. 2d 603, 625-26 (E.D. La. 2010). Thus in this case the irreparable due process harm is the deprivation of Plaintiff's First Amendment rights without due process of law. Plaintiff also faces irreparable substantive First Amendment harms. The Court need not and does not reach the issue of whether a violation of due process in the abstract is irreparable.

[5] Another District Court has found that changed policies of a similar nature do assuage any threat of irreparable harm. *See Prison Legal News v. Lindsey*, No. 3:07-CV-00367-P, Dkt. No. 23, at 9 (N.D. Tex., June 18, 2007). That case addressed a somewhat different policy, however, which that court appears to have found adequately protective of inmates' constitutional rights. *Id.* at 7.

resentment toward Plaintiff that might—if left unchecked—interfere with Plaintiff's rights. Such resentment is a natural reaction to the kind of provocation that Plaintiff has initiated through this action. Though the Court is anxious to reaffirm its faith in the dedication, skill, and impartiality of Upshur County officials, it sees merit in a "trust but verify" approach.

Despite its improvements, Defendants' new Correspondence Plan leaves the door open to suspect that, absent an injunction, more constitutional violations might be in the offing. The Correspondence Plan is clear in its mention of appeals only as to one of three categories of content that might justify censorship. It also provides for appeal, but does not specify whether both senders and recipients of censored mail have a right of appeal (Dkt. No. 42-1, at 5-7). These drafting inadequacies should not be overlooked.

Finally, the most obvious reason to find a substantial threat of imminent harm is past practice. The Defendants' adoption of this new Correspondence Plan communicates to anyone paying attention that life under the prior (pre-September 2013) practice at UCJ was not what it should have been. Nelson's declaration confirms this. These prior wrongs raise a realistic threat of imminent harm in the future.

**C. Balance of Harms and Public Interest**

Without a preliminary injunction, the Court is persuaded that Plaintiff would likely suffer irreparable harm to its First Amendment rights. Defendants, however, will not be harmed by the injunction the Court orders today. This Court is particularly mindful of the comity due local officials in the domain of their expertise; of the substantial difficulty of Defendants' duties; of the benefit to public safety Defendants provide; and the cost to the public of additional burdens on Defendants. In order to minimize any additional burden, the Court has elected to use Defendants' Correspondence Plan as the basis for its injunctive relief. The Court believes that

Defendants will be subject only to a slight modification of a Plan it is currently in the process of implementing. These alterations—which the Court finds are the minimum necessary to satisfy the requirements of the Constitution—should not harm Defendants or burden their ability to carry out their already difficult duties. The Court finds that its injunction weighs strongly in the public interest—remedying constitutional defects in a public institution while intruding only minimally, if at all, on the local government at hand. The Court specifically finds that its injunction will have no adverse effect on public safety, since the Jail may censor (with appropriate process) any communications that legitimately threaten safety either inside or outside the Jail.

## IV. CONCLUSION

Having carefully considered the pleadings of the parties, the Court finds that a preliminary injunction is warranted. Modifications to UCJ's Correspondence Plan are necessary in order to meet the minimum standards guaranteed by the First and Fourteenth Amendments to the Constitution of the United States. The Court finds that the Constitution requires the injunctive relief below, that the relief is narrowly drawn, and that it extends no further than necessary to remedy the threat of imminent and irreparable harm. *See* 18 U.S.C. § 3626. Accordingly, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motion (Dkt. No. 2) as follows:

## V. INJUNCTION

The Court hereby **ORDERS AND ENJOINS** Defendants as set forth hereafter:

1) Defendants shall abide by the terms of its Correspondence Plan (Dkt. No. 42-1, at 5-7), except with respect to Sections (IV) and (VI) of said plan.

2) In lieu of Section (IV) of the Correspondence Plan above cited, the Defendants shall implement and abide by the following terms:

**Section (IV)**

Some correspondence may be rejected, on a case-by-case basis, provided it falls under one of the following definitions:

a. Material that contains information regarding the manufacture of explosives, weapons, or drugs;

b. Material that a reasonable person would construe as written solely for the purpose of communicating information designed to achieve the breakdown of jails through inmate disruption such as strikes or riots;

c. Material for which a specific factual determination has been made that it is detrimental to inmate's rehabilitation because it would encourage deviant, criminal, or sexual behavior or otherwise be adverse to legitimate penological interests.

The inmate and the sender will be informed within 72 hours of any rejection of mail pursuant to (a), (b), or (c) above, or Section (VI), below. Notice to the inmate and the sender shall include the reason for rejection; notice of the opportunity for appeal; and procedures for requesting an appeal. Notice to the sender shall be deemed to be given three days after such is postmarked as first-class mail, postage prepaid, properly addressed and placed within the care of the United States Postal Service. Notice to the inmate shall be deemed to be given when hand-delivered to the inmate while incarcerated in the Upshur County Jail, or, if the inmate is no longer held in the Upshur County Jail, three days after notice is postmarked as first-class mail, postage prepaid, properly addressed and placed within the care of the United States Postal Service. The inmate or the sender or both may request an appeal within 21 days of their notice of rejection. Appeals shall be considered and decided by the Sheriff of Upshur County, Texas ("Sheriff") within 72 hours of receipt of a request for appeal. If the Sheriff is unavoidably unable to hear an appeal within the time allotted, the Sheriff may so certify in writing, in which case the Chief Deputy Sheriff of Upshur County ("Chief Deputy") may consider and decide the appeal. If both the Sheriff and the Chief Deputy are unavoidably unable to hear an appeal within the time allotted, they may both so certify in writing, in which case the Chief Jail Administrator for Upshur County, Texas may consider and decide the appeal. Appellants shall be informed in writing of the hearing official's decision within 24 hours of the decision being made.

Any rejected mail will be retained and filed in the inmate's personal property file. Each publication will be accepted or rejected individually. If

a prisoner refuses delivery of mail, the Jail shall obtain a written release signed by the prisoner and so indicating such refusal.

3) Defendants shall abide by the terms of Section (VI) of the Correspondence Plan, except that:

a. In the second sentence of the second paragraph of Section (VI) ("A copy of the original correspondence should be retained"), the word "should" is replaced with the word "shall."

b. The following paragraph is appended to the end of Section (VI):

> In the event that any correspondence or its contents is altered, damaged, withheld, or otherwise censored (beyond being merely opened and read) in accordance with the terms of this section, both the sender and recipient shall be notified and presented with the opportunity for an appeal as described in Section (IV) above.

**So ORDERED and SIGNED this 30th day of September, 2013.**

RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE